UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO.: 1:07CV-5-R

JANICE F. CURRY                                                                                    PLAINTIFF

v.

EATON CORPORATION, and                                                                  DEFENDANTS

BROADSPIRE SERVICES, INC.

## MEMORANDUM OPINION

This matter comes before the Court on the Defendants' Motion for Summary Judgment
(Docket #16).  The Plaintiff has responded (Docket #20), the Defendant has replied (Docket
#27), and the Plaintiff has filed a surreply (Docket #26).  In response to this Court's Order of
February 15, 2007, Plaintiff has filed a Memorandum supporting the reversal of the termination
of her long-term disability benefits and reinstatement of same (Docket #17).  Defendants filed a
response in opposition to this memorandum (Docket #19).  This matter is ripe for adjudication.
For the following reasons, the Defendants' Motion for Summary Judgment is **GRANTED.**

## BACKGROUND

The Eaton Corporation Long Term Disability (LTD) Plan is a self-insured plan
administered by Eaton.  Broadspire Services, Inc. ("Broadspire") is the Plan's claims
administrator.  A participant may be eligible for monthly LTD benefits if the participant cannot
work due to an illness or injury, the participant has a covered disability as defined by the Plan,
and the participant is under the continuous care of a physician who verifies to the satisfaction of
the Claims Administrator that the participant is totally disabled.

The LTD Plan has a two-tiered definition of "covered disability," defining "covered
disability" as follows:

You are considered to have a covered disability (see "Disabilities NOT Covered" for exceptions) under the Plan if:

• During the first 24 months of such disability, inclusive of any period of short term disability, you are totally and continuously unable to perform the essential duties of your regular position with the Company, or the duties of any suitable alternative position with the Company, and

• During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training or experience - at Eaton Corporation or elsewhere.

The Plan further provides, in relevant part:

Objective findings of a disability are necessary to substantiate the period of time your physician indicates you are disabled.  Objective findings are those that can be observed by your physician through objective means, not just from your description of the symptoms. Objective findings include:

• Physical examination findings (functional impairments/capacity);

• Diagnostic tests results/imaging studies;

• Diagnosis

• X-ray results;

• Observation of anatomical, physiological or psychological abnormalities; and

• Medications and/or treatment pain

The Plan also requires periodic certification of the participant's disability status, which can include independent medical examinations and/or functional capacity tests.

Plaintiff was employed by Eaton Corporation from October 17, 1985, until July 7, 1997, as an assembly line machine operator.  Plaintiff ceased working for Eaton due to lumbar spondylosis and filed for disability benefits.  Plaintiff also claimed to suffer from fibromyalgia.

Plaintiff received short term disability benefits under the Eaton Corporation Short Term

2

Disability Program from July 8, 1996, through January 3, 1997.  Plaintiff applied for LTD benefits under the first tier definition of the LTD Plan and those benefits were approved effective January 4, 1997.  Plaintiff was thereafter approved for LTD benefits under the LTD Plan's second tier definition of "covered disability."  After 1997, Plaintiff reported additional diagnoses of depression and high blood pressure.

A May 24, 2003, office visit note from Plaintiff's family physician, Dr. William Feltner, D.O., revealed normal range of motion on her muscoloskeletal examination.  Plaintiff's treating physician for her back problems, Dr. George Raque, M.D., refused to submit an Attending Physician Statement (APS) in June 2003, because he had not seen Plaintiff in two years.  A June 2003 APS from Dr. Feltner did not mention back problems, listed restrictions consistent with sedentary work, but stated Plaintiff was completely disabled due to fibromyalgia.[1]

In response to a periodic request from the Claims Administrator for an update of her condition, Plaintiff submitted a Resource Questionnaire dated June 4, 2003, and a Medical Provider List dated June 13, 2003, to the Claims Administrator.  Plaintiff indicated that she could cook, do dishes, do laundry, and dust, but that she did not drive and instead was driven by her husband. Plaintiff also indicated that she had trouble sleeping due to pain.  She stated that her last visit with Dr. Feltner was May 24, 2003, but that she could not remember her last visit with Dr. Raque.

As provided in the LTD Plan, Broadspire routinely reviews a claimant's qualifications for receipt of disability benefits.  On November 13, 2003, Vaughn Cohan, M.D., a neurologist, reviewed the Plaintiff's claim file and concluded that Plaintiff was capable of sedentary work, stating:

---

[1] Dr. Feltner stated that Plaintiff could not lift or bend repetitively or lift more than fifteen pounds.

> In summary, this claimant suffers from chronic low back pain and has been out of work for approximately 7 years. The medical records submitted for review failed to demonstrate objective evidence of a functional impairment which would preclude the claimant from performing "any occupation." There is no evidence of impaired cognitive function or impaired function of the upper extremities and there is no evidence of problems with gait, coordination, or endurance for performing work while seated at a desk. Appropriate restrictions and limitations would be those consistent with a sedentary job.

On November 18, 2003, Russell Superfine, M.D., an internal medicine specialist, reviewed Plaintiff's claim file, coming to the same conclusion as Dr. Cohan. Dr. Superfine observed:

> In summary, the claimant has a diagnosis of fibromyalgia, however, the submitted physical and diagnostic findings would not support a functional impairment which would preclude the claimant from performing the duties of any occupation. The claimant could at least perform sedentary activities but specific restrictions and limitations could not be determined based on the submitted documentation.

In addition to arranging for physician reviews of Plaintiff's claim file, the Claims Administrator arranged for an independent Functional Capacity Evaluation (FCE) of Plaintiff on December 18, 2003. Laura Goulbourne, PT, concluded:

> Based on the U.S. Department of Labor definitions for **WORK** and accompanying physical exertion demand levels, it is this examiner's conclusion that the examinee qualifies for the **SEDENTARY** work category, provided that the work criteria . . . are integrated into any return-to-work considerations.
>
> . . .
>
> Ms. Curry was working on a factory line at the time of her long-term disability. A specific job description was not provided, but it is known that her *placeability profile* has incurred some adjustments and more than likely would not be able to return to her traditional occupational category safely and effectively, meeting productions quotas while performing at a minimum risk of injury to herself or coworkers.

In a letter dated April 23, 2004, Broadspire informed Plaintiff that, based upon a review of the records provided, she was capable of returning to work, that she was not disabled from any occupation as defined by the LTD Plan, and that her LTD benefits would cease as of June 1, 2004.

4

Plaintiff was also given information concerning her appeal rights.

Plaintiff formally appealed Broadspire's decision to discontinue her benefits on October 18, 2004.

By letter dated January 28, 2005, to Broadspire, Plaintiff enclosed medical documentation purporting to support her appeal as well as an affidavit.  The affidavit from Plaintiff, dated October 15, 2004, attested to Plaintiff's work experience, her disability, her pain and side effects from pain medication, her experience of the FCE, and her daily activities and treatment.  Plaintiff also included records of her physician, Dr. Raque, dated from July 30, 2004, through December 27, 2004.  Plaintiff also enclosed records from Spring View Hospital dated August 19, 2004, regarding to a series of three lumbar epidural steroid injections.  Included in the letter were handwritten office visit notes from Dr. Feltner dated December 27, 2003, through September 25, 2004.  Additionally, Plaintiff enclosed a Report Concerning Employability dated December 2, 2004, from Stephen Schnacke, Ed.D.

Broadspire subsequently engaged physicians specializing in physical medicine and rehabilitation, as well as neurosurgery, to review Plaintiff's file.  In a peer review dated April 15, 2005, Sheldon Meyerson, M.D., specializing in neurosurgery, observed:

> This 55-year-old female has been out of work since 1996 initially for fibromyalgia and then for neck and back and leg pains, which had been attributed to degenerative disease in the lumbar region and small non-surgical cervical disc herniations.  She has been denied long-term disability benefits as of 09/01/04 for any occupation.
>
> Fibromyalgia is a very difficult diagnosis to substantiate, usually requiring a rheumatologist, which is a specialty that does deal in this condition and delves deeply into the history and physical findings to substantiate that diagnosis.  In the claimant's case, the diagnosis was essentially mentioned several times by the primary care physician with no physical findings or significant history to support the diagnosis.  She had myalgias and some muscle tenderness mentioned.  There is no significant information regarding the fibromyalgia that would prevent her from

5

performing any type of work in the records reviewed.

She has been evaluated and treated and followed intermittently by her neurosurgeon, Dr. Raque, and mostly these visits were infrequent, ranging from several month intervals to one year interval and once on a two-year interval. Her complaints have been essentially unchanged. There is no pattern of pain being severe enough to require frequent visits. Mostly, the physical examinations have been negative with only a few descriptions of diminished range of motion with no indication of the severity of limitation of motion. The neurological examinations have mostly been normal. Straight leg raising sign actually on only 2-3 occasions was positive, but not significant in terms of relation to nerve root compression.

. . .

At this time, having been deconditioned all these years by a totally limited lifestyle because of pain that she complains of, which was poorly substantiated by physical findings, she was still found in Functional Capacity Evaluation to be suitable for sedentary work categories with adjustments for placement and employability profiles.

. . .

The claimant does mention that she feels drowsy from the medications. I am not sure whether she could be weaned off some of the heavier medications that she is taking. I only saw that she was taking antiinflammatory medications. I am not aware that she is on narcotics. There is no documentation of any significant cognitive impairment. Therefore, it should not impact her ability to work.

In a letter dated April 20, 2005, Broadspire informed Plaintiff that after reviewing the file, its original decision to discontinue LTD benefits was upheld.

By letter dated October 10, 2005, Plaintiff appealed  Broadspire's decision to uphold its denial of continued LTD benefits as of June 1, 2004. Plaintiff subsequently forwarded office visit notes from Dr. Raque dated August 22, 2005. Plaintiff also submitted numerous medical records recording the diagnosis and treatment of thyroid nodules during 2005.

In a peer review dated November 9, 2005, Tamara Bowman, M.D., specializing in internal medicine and endocrinology, assessed Plaintiff's medical records, observing:

6

In summary, from an internal medicine perspective, the claimant has diagnoses of fibromyalgia and thyroid nodules. She has been noted on occasion to have some diffuse muscle tenderness, but there is no documentation of decreased range of motion, objective muscle weakness, signs of radiculopathy, sensory examination findings, joint deformity or effusion, or synovitis. Her gait is documented to be normal. There is no evidence of collagen vascular disease, rheumatoid arthritis, or other inflammatory arthritis in the claimant. There is no documentation of positive serologic markers of inflammation. In regards to the claimant's diagnosis of thyroid nodules, surgery has apparently been planned, and it is unknown if the claimant has undergone surgery for this. There is no documentation of an Operative Report or Pathology Report. There is no evidence of a thyroid malignancy. Although the claimant's most recently documented TSH level is decreased, there is no documentation of clinical signs or symptoms of hyperthyroidism in the claimant that would preclude work. There is no documentation of objective physical examination findings, laboratory abnormalities, or diagnostic study results to support a functional deficit in the claimant that would preclude work.

Therefore, from an internal medicine standpoint, there are insufficient objective clinical findings documented to support a level of functional impairment that would render the claimant unable to perform "any occupation" from 06/01/04 onward.

Maine Wancier, M.D., specializing in neurosurgery, provided a peer review dated November 7, 2005. Upon reviewing Plaintiff's medical records, Dr. Wancier observed that the medical information did "not preclude the claimant from performing the activities of any occupation or her own occupation in the physical exertion level of sedentary from 06/01/04 forward." Lucy Cohen, M.D., specializing in physical medicine and rehabilitation, also completed a peer review of Plaintiff's claim file on October 20, 2005, making the following finding:

Based on the documentation, the information does not support a functional impairment from 6/1/04 through the present. The physical findings do not show a specific functional impairment that would preclude the claimant from performing the essential functions of any occupation.

Sedentary work restrictions would be reasonable with frequent change of positions required. They would be permanent.

Upon its receipt of the entire claim file from Broadspire, Eaton submitted the entire record to two independent third party medical reviewers, engaged through Medical Review Institute of

America (MRIoA) for a comprehensive total assessment.  The first specialist practiced orthopedic surgery and the other specialized in neurology.  The physician reviewer practicing orthopedic surgery, in a report dated December 12, 2005, reviewing the entire record since 1996 and considering all Plaintiff's conditions taken together, concluded:

> This reviewer agrees with the other peer reviewers.  This patient has claims of back pain but the records do not indicate any positive clinical findings.  She has MRI evidence of degenerative disc disease but this occurs with aging and is not necessarily a cause of pain.  She has a diagnosis of fibromyalgia but none of her clinical exams mention multiple trigger points which is a hallmark of this disorder.  There is no record of an evaluation by a rheumatologist.  Her functional capacity evaluation 12/18/03 concluded that she could do sedentary work.  Therefore, there is no evidence to support a claim of total disability after 6/01/04.

The physician reviewer practicing neurology provided an assessment, dated December 12, 2005, consistent with these conclusions.

Eaton, as Plan Administrator, issued a final determination dated January 6, 2006, upholding Broadspire's denial of continued LTD benefits after May 31, 2004.  The letter indicated the following basis for determination:

> Ms. Curry's medical records do not support a finding of disability.  Ms. Curry's medical records reflect that she appears to suffer from a number of medical conditions, including chronic back pain, fibromyalgia, thyroid disease and depression.

> With respect to depression, the Disability Plan provides that, in order to be deemed disabled due to mental illness, the determination must be made by a psychiatrist.  Ms. Curry's records do not reflect any treatments by a psychiatrist.

> None of the records provide evidence of Ms. Curry's inability to perform sedentary work.

> Although the medical records make reference to fibromyalgia, there are no physical findings or history documented to support or describe the diagnosis.

> With respect to her back pain, the reviewer notes that she has MRI evidence of degenerative disc disease, but that such degenerative disc disease occurs with

aging. In addition, physical examinations related to back pain have been sporadic and mostly negative with only a few descriptions of limited range of motion. Ms. Curry has indicated that the pain is not significant enough to require surgery.

Although Ms. Curry's physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions. Further, each medical reviewer of Ms. Curry's information concluded that the objective information did not support a finding that Ms. Curry was unable to perform any occupation. A March 8, 2004 functional capacity evaluation reflected an ability to work at the sedentary level. The independent medical reviewers retained by the Plan Administrator concluded that, based on the available medical information, Ms. Curry would not be disabled from any occupation on June 1, 2004 . . . The independent medical reviewers' conclusions were based on their review of the medical records.

The Plan Administrator's determination as described in this Action afforded no deference to the initial adverse benefit determination or to the Claims Administrator's denial of the first level appeal regarding Ms. Curry's claim for continued long term disability benefits under the Disability Plan.

The present suit was filed on January 4, 2007, seeking a reversal of the termination of her LTD benefits and reinstatement of the same.

## STANDARD

In *Wilkins v. Baptist Healthcare Systems, Inc*., the Sixth Circuit Court of Appeals held that § 502(a) actions were not subject to Federal Rule of Civil Procedure 56 motions. *Wilkins v. Baptist Healthcare Systems, Inc*., 150 F.3d 609, 617 (6th Cir. 1998). Instead, this Court must conduct a *de novo* review based on the administrative record; it must render findings of fact and conclusions of law, *id.* at 613, 619, unless the benefit plan gives the administrator discretion to determine eligibility or construe the plan's terms, in which case an arbitrary and capricious standard applies. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the

parties agree that the Plan grants its administrators such discretion.[2]   Accordingly, the Court shall apply an arbitrary and capricious standard of review.

When applying an arbitrary and capricious standard of review, this Court must determine whether "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062,1071 (6th Cir. 1994) (citing *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).  If such an explanation is available, this Court must respect the decision of the claims administrator and uphold it.  *Id.* In evaluating those decisions, this Court must consider only the evidence before the administrator at the time, *Daniel v. Eaton Corp.*, 839 F.2d 263, 266-67 (6th Cir. 1988), and must account for potential conflicts of interest.  *Kulkarni v. Metropolitan Life Ins. Co.*, 187 F. Supp.2d 724, 727 (W.D. Ky. 2001) (citing  *Firestone Tire and Rubber Co., v. Bruch*, 489 U.S. 101, 115 (1989); *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir.1998)).  Lastly, in *Miller v. Met Life Ins. Co.*, the Court states that "[a]n ERISA plan administrator's denial of benefits is not arbitrary and capricious as long as it is rational in light of the plan's provisions." 925 F.2d 979,

---

[2]  The portion of the LTD Summary Plan Description entitled PLAN INTERPRETATION states in pertinent part:

> Benefits under the Eaton Long Term Disability Plan will be paid only if the Plan Administrator and/or Claims Administrator decides that the applicant is entitled to them under the terms of the Plan.  The Plan Administrator and/or Claims Administrator has discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including but not limited to, any dispute or doubtful terms.  The Plan Administrator and/or Claims Administrator also has the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan.  Any and all determinations by the Plan Administrator and/or Claims Administrator will be conclusive and binding on all persons, except to the extent reviewable by a court with jurisdiction under ERISA.

984 (6th Cir. 1991).

## DISCUSSION

The Defendants assert that the decision to deny Curry's claim for continued LTD benefits was not arbitrary and capricious because the Administrative Record demonstrates that Curry's claim was given a full and fair review, and substantial medical evidence confirmed Curry's functional capacity for work.  In response, Curry submits that the Defendants' reversal of her LTD benefits was arbitrary and capricious because (1) she was denied a full and fair review because Defendants improperly resolved any conflicting medical opinions in favor of their own peer reviewers; (2) the medical professionals retained by the Defendants were provided only "cherry-picked" information; (3) there was a conflict of interest because Eaton, as plan administrator, is authorized by the plan to decide both whether an employee is eligible for benefits and to pay those benefits; and (4) the Defendants improperly failed to consider to her continued receipt of Social Security Disability benefits.

To begin, the Court's review is confined to the administrative record as it existed on January 6, 2006, when Eaton issued its final decision upholding Broadspire's termination of Curry's  LTD benefits.  *Wilkins v. Baptist Healthcare Sys*., 150 F.3d 609, 614 (6th Cir. 1998). Any assertions by either party to the contrary are incorrect.

## 1.  Was Curry deprived of a full and fair review?

### A.  Curry's treating physicians and the Defendants' peer reviewers

Curry makes much of the fact that the opinions of medical professionals engaged by the Defendants to review her claim are inconsistent with the opinions of her treating physicians. Curry argues that the Defendants ignored substantial evidence from her treating physicians and

relied solely upon the reports of the physician peer reviewers, the physical therapist who conducted the Functional Capacity Evaluation (FCE), and Broadspire's Field Care Manager who prepared the Labor Market Survey (LMS) and Employability Assessment Report (EAR).

Curry began seeing Dr. George Raque, a neurosurgeon, in 1996 after she began suffering constant low back pain as well as neck and shoulder pain which did not respond to medication or chiropractic treatment.  Curry applied for and was awarded short-term disability benefits, and she ultimately was awarded long-term disability benefits effective January 4, 1997.  In a 1999 Attending Physician Statement, Dr. Raque labeled Curry's level of impairment as "Class 5. Severe limitation of functional capacity/incapable of work."  In 2000, Dr. Raque stated in an Estimated Function Capacities Evaluation that Curry could not work at that time.  Dr. Raque did not treat Curry from July 9, 2001, to July 14, 2003.  In 2004, after Broadspire discontinued Curry's benefits, Dr. Raque completed a Residual Functional Capacity Assessment for Curry, stating she could "work with a sit or stand option, with short breaks every two hours" for less than 4 hours, would be expected to miss 5 or more days a month of work, and that her condition was permanent.  In office notes from a follow-up appointment on August 22, 2005, Dr. Raque stated that he did not think Curry was able to go back to work, that she was incapable of even a sedentary job because it would require prolonged sitting, and that there was a reasonable medical probability that she would never return to work.

Curry claims she has been seeing Dr. Feltner for a number of years with respect to her fibromyalgia.  In Attending Physician Statements dated September 23, 2002, and June 22, 2003, Dr. Feltner, labeled Curry's level of impairment as "Class 5.  Severe limitation of functional capacity/incapable of work."

12

Dr. Raque referred Curry to the Springview Hospital Pain Clinic where she received lumbar epidural steroid injections from Dr. Tirabasso in August 2004.  Dr. Tirabasso made no assessments regarding Curry's disability.

In contrast, beginning in November 2003 with Dr. Cohan, a neurologist, and Dr. Superfine, an internal medicine specialist, the physician peer reviewers engaged by Broadspire to review Curry's claim file consistently found that there was no objective evidence of a functional impairment that would preclude Curry from performing "any occupation," as defined in the Plan, and that she could perform a sedentary occupation.  Further, physical therapist Laura Goulbourne, who conducted Curry's FCE, concluded that Curry qualified for sedentary work, provided certain criteria regarding her physical restrictions were integrated into any return-to-work considerations.  Based on this information, Broadspire discontinued Curry's LTD benefits as of June 1, 2004.

On Curry's appeal, in April 2005, Broadspire engaged Dr. Sassoon, a physical medicine/rehabilitation specialist, and Dr. Meyerson, a neurosurgery specialist, to review Curry' claim file, including the materials she submitted on appeal.[3]  Dr. Sassoon concluded that Curry was not impaired from "any occupation" and could perform sedentary work.  Dr. Meyerson noted in regards to Curry's diagnosis of fibromyalgia, "[it] is a very difficult diagnosis to substantiate....In the claimant's case, the diagnosis was essentially mentioned several times by the primary care physician with no physical findings or significant history to support the

---

[3]On appeal, Curry submitted an Affidavit; records of Dr. Raque dated June 30, 2004, to December 27, 2004; records from Spring View Hospital dated August 19, 2004; handwritten office visit notes from Dr. Feltner dated December 27, 2003 to September 25, 2004; and a Report Concerning Employability dated December 2, 2004 from Stephen Schnacke, Ed.D.

diagnosis." He concluded that due to her need to have only infrequent visits with Dr. Raque and her performance on the FCE (after being deconditioned by a limited lifestyle for years) Curry was not impaired from "any occupation." Based on this information, Broadspire upheld its original decision to discontinue Curry's LTD benefits as of June 1, 2004.

On Curry's final appeal, in October and November 2005, Broadspire engaged Dr. Bowman, an internal medicine and endocrinology specialist, Dr. Wancier, a neurosurgery specialist, and Dr. Cohen, a physical medicine and rehabilitation specialist, to review Curry's claim file, including the medical records she submitted on final appeal.[4] Each of these peer reviewers concluded that Curry was capable of work at a sedentary level. Dr. Cohen did note that sedentary work restrictions would be reasonable so long as Curry was able to frequently change positions.

Also on Curry's final appeal, Broadspire submitted Curry's entire claim file to two third party medical reviewers, engaged through Medical Review Institute of America, for a total assessment of Curry's claim. On December 12, 2005, both of these reviewers issued reports agreeing with the other peer reviewers, concluding Curry was capable of sedentary work, and stating there was no evidence to support a claim of total disability. Based on this information, and the accumulated information gathered previously, Eaton, as plan administrator, issued a final determination dated January 6, 2006, upholding Broadspire's denial of continued LTD benefits after May 31, 2004.

While it does appear that Curry's treating physicians and the peer reviewers engaged by

---

[4]On her final appeal, Curry included office visit notes from Dr. Raque dated August 22, 2005 and medical records recording the diagnosis and treatment of thyroid nodules during 2005.

14

Broadspire disagree as to the severity of Curry's claim of disability, this does not render the Defendants' decision arbitrary and capricious.  There is no requirement that plan administrators "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  ERISA and federal regulations under the Act "require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials.  *Id.* (citing 29 USC § 1133; 29 CFR § 2560.503-1 (2002)).  However, "these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Id.*  There is no "discrete burden of explanation" placed upon plan administrators "when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.

Given all of this, however, plan administrators still cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*.  Therefore, the fact that the Defendants chose to rely on the opinions of the peer reviewers and independent medical reviewers does not render their discontinuation of Curry's LTD benefits arbitrary and capricious in and of itself.

It does not appear that the Defendants arbitrarily refused to credit the evidence of Curry's treating physicians, depriving her of a full and fair review.  There is sufficient information in the record to show that the Defendants at least considered Dr. Feltner, Dr. Tirabasso, and Dr. Raque's opinions, which is all that is required under the arbitrary and capricious standard.  *See Harris v. Kemper Ins. Cos*., 360 F. Supp. 2d 844, 849 (E.D. Mich. 2005).  The Defendants' decision was not arbitrary and capricious, because by relying on the consistent reports of multiple peer reviewers, they can offer a reasoned explanation, based upon the evidence, for

15

their decision.  *See Evans v. Unum Provident Corp.*, 434 F.3d 866, 876 (6th Cir. 2006) (citing *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169 (6th Cir. 2003)).

The Defendants argue that they chose not to rely on Dr. Feltner's assessments regarding Curry's fibromyalgia and other impairments because they were not supported by citation to specific objective evidence of impairment.  They argue that Curry omits portions of Dr. Tirabasso's report which, in their opinion, indicates that Curry was functional and unimpaired.  Further, the Defendants argue that Dr. Raque's assessments were either equivocal or inconsistent and not supported by clinical findings.

In the initial termination of benefits letter, Broadspire stated "You had a diagnosis of fibromyalgia; however, the submitted physical and diagnostic findings would not support a functional impairment which would preclude you from performing the duties of any occupation."  The letter goes on to note the large gap in treatment from Dr. Raque and states "the medical records you submitted for review failed to demonstrate evidence of a functional impairment which would preclude you from performing 'any occupation.'"  Broadspire suggests Curry obtain objective evidence of impairment in the form of a complete current physical evaluation with an emphasis on the musculoskeletal, mental status, and neurological examinations, along with thyroid function studies.  The Defendants argue they never received such objective documentation.

For the above reasons, the Court concludes that the Defendants' decision to rely upon the reports of its peer reviewers, instead of crediting the opinions of Curry's treating physicians, was not arbitrary and capricious.

**B.  "Cherry-picked" information**

In further support of her argument that she was denied a full and fair review, Curry argues that throughout the review process Broadspire provided the seven physician peer reviewers, the physical therapist who conducted the FCE, and the Field Care Manager who prepared the Labor Market Survey (LMS) and Employability Assessment Report (EAR) with "cherry-picked" information regarding her medical condition.  In response, the Defendants contend they were provided with all the relevant documentation submitted and the decision to discontinue Curry's LTD benefits was amply supported.

An administrator acts arbitrarily and capriciously when it "engages in a 'selective review of the administrative record' to justify a decision to terminate coverage."  *Metro. Life Ins. Co. v. Conger*, 474 F.3d 258, 265 (6th Cir. 2007) (citing *Moon,* 405 F.3d at 381).  For example, if the administrator focuses on "slivers of information that could be read to support a denial of coverage" while ignoring, without explanation, "a wealth of evidence that directly contradict[s] its basis for denying coverage" it would be considered an abuse of discretion.  *Id.*

Curry's disability claim was reviewed over a three-step appeal process by a total of nine physicians qualified in fields related to her complaints.  While none of the peer reviewers physically examined Curry, each physician reviewed all of the documentation submitted to date in the case, and in their opinions they all list and describe the data they used to reach their conclusions.  *See id.* (citing *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 295 (6th Cir. 2005) as holding that it is arbitrary and capricious for an administrator to rely on the opinion of a physician who fails to explain basis for rejecting other physicians' conclusions).  After each review step Curry had the opportunity to submit additional medical documentation to support her claim, and Broadspire never denied Curry's requests for extensions to submit documentation.

17

Curry has not made any specific and substantiated claims of "cherry-picking" when it comes to the physician peer reviewers.  In regard to Dr. Cohen and Dr. Superfine, who conducted peer reviews in November 2003, and Laura Goulbourne, who conducted the FCE in December 2003, Curry seems to argue they were provided with cherry-picked information because they were not given documents produced by Dr. Raque in 2004.  This is obviously impossible, and the Court sees no evidence in the record that these two doctors and Goulbourne were provided anything but all the relevant medical documentation that existed as of November and December 2003.  Curry's attacks against the other peer reviewers range from lack of thoroughness to lack of analysis.  These allegations are very subjective, and the Court sees no evidence that the peer reviewers were provided anything less than the full file or that they somehow performed sub-part analyses.

In contrast, the Court does see evidence of cherry-picking in Broadspire's Labor Market Survey (LMS) and Employability Assessment Report (EAR) prepared by Chau D. Nguyen-truong in March and April 2004, prior to discontinuing Curry's LTD benefits.  First, there is no indication that Nguyen-truong considered any of Dr. Raque's medical reports.  Dr. Raque has been treating Curry since 1996 and there are pre-2004 reports in the record which indicate that Dr. Raque considered Curry to be totally disabled.  Instead, Nguyen-truong only considered (1) Dr. Superfine's peer review of November 18, 2003, which indicated that Curry should be able to engage in sedentary work (Dr. Superfine does not appear to have considered any reports from Dr. Raque either); (2) the Functional Capacity Evaluation; (3) one Attending Physician Statement from Dr. Felton (where he classified Curry as Class 5. Severe Limitation of Functional Capacity/Incapable of Sedentary Work); and (4) a resource questionnaire Curry filled out in June

18

2003.

As previously stated, Broadspire is not required to "accord special deference to the opinions of treating physicians." *Black & Decker*, 538 U.S. at 825.  However, it cannot arbitrarily refuse to credit reliable evidence such as the opinions of a treating physician.  *Id*. at 834.  Thus, although Dr. Raque, as Curry's treating physician, was in the best position to determine her disability, the Court can only require Broadspire to *consider* his opinion.  *See Harris v. Kemper Ins. Cos*., 360 F. Supp. 2d 844, 849 (D. Mich. 2005).  Here, however, there is no evidence that Dr. Raque's opinions were considered at all in creating the LMS and EAR.

Second, both the LMS and the EAR state that Curry's labor market is a fifty-mile radius of her home in Edmonton, Kentucky.  Nguyen-truong incorrectly states that both Louisville, Kentucky and Cincinnati, Ohio are within fifty miles of Edmonton.  They are not, and this misinformation renders both the LMS and the EAR unreliable.  Further, in the LMS, Nguyen-truong only lists wage/earnings ranges for selected occupations in Louisville and Cincinnati, neither of which is within Curry's appropriate market area.  Every employer with available job openings Nguyen-trunong contacted are located in Ohio.  Nearly every position identified is in Customer Service; Curry has only worked factory or janitorial jobs since graduating high school in 1970, and has not worked since she ceased working for Eaton on July 7, 1996.

Therefore, to the extent Broadspire may have relied upon the LMS and EAR in initially denying Curry LTD benefits, the Court finds the decision would have been arbitrary and capricious.  The Defendants admit that the LMS is of little use because it incorrectly identifies the geographical area of Curry's job search.  However, the Defendants claim that the LMS and EAR were not critical to the determination that Curry was no longer disabled under the terms of

19

the Plan as of June 1, 2004, because they and are not listed in the Plan's terms as evidence that

may be used to substantiate a disability claim.  Further, it appears the Court that the EAR and

LMS are meant as aids for Plan participants whose benefits are denied or discontinued, and who

must therefore reenter the work force.  The EAR and LMS were not prepared by a medical

professional, and therefore would not have assisted the Defendants in reaching a conclusion

regarding Curry's disability.  For these reasons, the inaccurate LMS and EAR are not

determinative of the Court's decision here.  As the Court does not find that the physician peer

reviewers engaged by the Defendants were provided "cherry-picked" information, the

Defendants' decision to rely upon their opinions was not arbitrary and capricious.

**2.  The Existence of a Conflict of Interest**

Where a plan authorizes an administrator "both to decide whether an employee is eligible

for benefits and to pay those benefits," it creates "an apparent conflict of interest."  *Cooper v.*

*Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007) (quoting *Glenn v. Metro. Life. Ins. Co.*,

461 F.3d 660, 666 (6th Cir. 2006)).  An alleged conflict of interest must be taken into

consideration by the courts in determining whether a denial of LTD benefits was arbitrary and

capricious.  *Id.*  "Sixth Circuit caselaw requires a plaintiff not only to show the purported

existence of a conflict of interest, but also to provide 'significant evidence' that the conflict

actually affected or motivated the decision at issue.  *Id.*  (citing *Peruzzi v. Summa Med. Plan*,

137 F.3d 431, 433 (6th Cir. 1998))

In the Curry's Memorandum filed with the Court, she argues a conflict of interest exists

in this case because Eaton is not only responsible for payment of any benefits from the plan, but

it also appointed Broadspire to manage the claims and made the final determination in denying

Curry's appeal.  Curry, however, did not reiterate this argument in response to the Defendants'

motion for summary judgment.  Curry has not provided any evidence that Eaton's denial of LTD

benefits was motivated by its alleged conflict of interest; she has done no more than assert that

one exists.  Such conclusory statements will not suffice to establish such a conflict. *See Cooper*,

486 F.3d at 165.

On Curry's final appeal, Eaton referred the entire record to two independent third party

medical reviewers, one an orthopedic surgeon and the other a neurologist, engaged through the

third-party company Medical Review Institute of America (MRIoA).  Both reviewers concluded

that Curry was not disabled from the Plan's "any occupation" definition.  Therefore, the Court

concludes that Eaton's dual status as disability decision-maker and payor of benefits did not in

and of itself lead to an arbitrary and capricious determination of Curry's claim. *See id.*

### 3.  Curry's receipt of Social Security Disability Benefits

The Defendants assert that Curry's continued receipt of Social Security Disability (SSDI)

benefits is not determinative of her continued eligibility for benefits under the LTD plan.

Further, the Defendants argue that the Social Security Administration's (SSA) determinations of

Curry's eligibility in 1998 and 2002 are not relevant to the Claims Administrator's decision to

discontinue Curry's LTD benefits in 2004 because the Administrator was able to consider more

recent evidence.  Curry concedes that the SSA's determination does not bind this Court, but does

argue that it should be given some weight and should be considered by the Court in its arbitrary

and capricious review.

After Curry was awarded benefits by the SSA in 1998, the Defendants' Administrator at

the time, First Health, demanded reimbursement of $9,301.81 of disability benefits previously

21

paid to Curry under an offset provision in the plan, which Curry paid.  There is no indication in the record that Curry filed for SSA benefits at the Defendants' direction or encouragement.[5]

The SSA, unlike ERISA plan administrators, is required to give deference to the opinions of a claimant's treating physician.  *Calvert,* 409 F.3d at 293.  As discussed above, ERISA "plan administrators may not arbitrarily reject to refuse to consider the opinions of a treating physicians, but 'are not obligated to accord special deference'" to their opinions.  *Id.* (quoting *Black & Decker*, 538 U.S. at 825).  The ERISA Act does not "impose a heightened burden of explanation on administrators when they reject a treating physician's opinion."  *Black & Decker*, 538 U.S. at 830-31.  While plan administrators are not "estopped from disagreeing with an SSA award whenever the plan benefits from such award," as the Defendants did here, they should at least give appropriate weight to that determination.  *Calvert*, 409 F.3d at 295.  The SSA determination to award benefits is one factor the Court "should consider, in the context of the record as a whole, in determining whether [the Defendants'] contrary decision was arbitrary and capricious."  *Id.*

Here, the SSA's initial determination to award Curry benefits occurred six years before Broadspire discontinued Curry's LTD benefits, and eight years before Eaton, as Plan Administrator, issued a final determination upholding Broadspire's denial of continued LTD benefits after May 31, 2004.  Thus, the Plan considered Curry's condition much later in time, and received substantial medical evidence that did not exist at the time of the SSA's ruling,

---

[5]When a plan administrator *requires* and/or actively encourages a claimant to apply for social security benefits, and then benefits from the SSA determination by seeking reimbursement for LTD benefits payments, the courts should give such a determination greater weight in evaluating the administrator's decision under the arbitrary and capricious standard than the Court does here.  *See Glenn*, 461 F.3d at 666-669; *Calvert*, 409 F.3d at 293-295.

including (1) two peer reviews of Curry's claim file in November 2003; (2) the conducted in December 2003; (3) two peer reviews conducted in April 2005; (4) three peer reviews conducted in October and November 2005; and (5) two independent third party medical reviews in December 2005.  All of these concluded there was no evidence to support a claim of Curry's total disability precluding her from work in "any occupation."

The Court reiterates and adopts its conclusions contained in Section 1 of this opinion regarding the contrast among Curry's treating physicians and the Defendants' peer reviewers. Accordingly, for the same reasons discussed above, it was not arbitrary and capricious for the Defendants to conclude that the SSA's determination was not relevant to its own determination. Even assuming that the SSA's ruling tends to support Curry's assertion, it does not undermine the Court's conclusion that substantial record evidence supports the Defendants' contrary determination.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is **GRANTED.**

An appropriate order shall issue.