UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CASE NO: 1:07CV-5-R

JANICE F. CURRY                                                    PLAINTIFF

v.

EATON CORPORATION, and
BROADSPIRE SERVICES, INC.                                DEFENDANTS

## MEMORANDUM OPINION

This matter comes before the Court on the Plaintiff's Motion to Alter, Amend, or Vacate (Docket #34) the Memorandum Opinion and Order entered by this Court on October 30, 2007, (Docket #32, Docket #33) granting the Defendants' Motion for Summary Judgment.  The Defendants responded to the Plaintiff's motion (Docket #35) and the Plaintiff replied (Docket #36).  This matter is now ripe for consideration.  For the following reasons, the Plaintiff's Motion is **DENIED**.

## BACKGROUND

The facts of this case are set forth extensively in the October 30, 2007, Memorandum and Opinion and Order.  The Court will not reiterate all of those facts here but will treat them as incorporated into this opinion.  This is a claim for a reversal of the termination of Long Term Disability (LTD) benefits and reinstatement of the same, brought under Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 et seq,. and the facts are restricted to the Administrative Record and are not subject to change.

The Eaton Corporation Long Term Disability Plan (the "Plan"), is a self-insured plan.  Broadspire Services, Inc. ("Broadspire") is the Plan's claims administrator.  The Plan has a two-tiered definition of "covered disability," defining "covered disability" as follows:

You are considered to have a covered disability (see "Disabilities NOT Covered" for exceptions) under the Plan if:

• During the first 24 months of such disability, inclusive of any period of short term disability, you are totally and continuously unable to perform the essential duties of your regular position with the Company, or the duties of any suitable alternative position with the Company, and

• During the continuation of such total disability following the first 24 months, you are totally and continuously unable to engage in any occupation or perform any work for compensation or profit for which you are, or may become, reasonably well fitted by reason of education, training or experience - at Eaton Corporation or elsewhere.

Broadspire routinely reviews a claimant's qualifications for receipt of disability benefits. Broadspire notified the Plaintiff in a letter dated April 23, 2004, that based upon a review of the records provided, she was capable of returning to work, that she was not disabled from "any occupation" as defined by the LTD Plan, and that her LTD benefits would cease as of June 1, 2004. Plaintiff was also given information concerning her appeal rights.

As explained below, in her Motion to Alter, Amend, or Vacate, the Plaintiff challenges the Defendants' presentation, and the Court's interpretation, of the facts surrounding the termination of her LTD benefits in the Memorandum Opinion and Order granting the Defendants' Motion for Summary Judgment (the "Opinion"). As the facts of this case are limited to the Administrative Record, the Plaintiff does not, and cannot, advocate that there is new evidence supporting her claim that her benefits were improperly terminated.

## STANDARD

The court may grant a motion to alter or amend, pursuant to Federal Rule of Civil Procedure 59(e), "if there is a clear error of law, newly discovered evidence, an intervening change in controlling law or to prevent manifest injustice." *GenCorp v. American International*,

2

178 F.3d 804, 834 (6th Cir.1999) (internal citations omitted).  "[C]ourts typically will consider additional evidence accompanying a Rule 59(e) motion only when it has been newly discovered, and that to [c]onstitute 'newly discovered evidence,' the evidence must have been previously unavailable." *Id.*  A Fed. R. Civ. P. 59(e) motion to alter does not provide the Plaintiff another opportunity to argue the merits of her case.  *Id*.

The "newly discovered evidence" criteria cannot apply here because the Court's review was and is confined to the Administrative Record as it existed on January 6, 2006, when Eaton issued its final decision upholding Broadspire's termination of Curry's  LTD benefits.  *Wilkins v. Baptist Healthcare Sys*., 150 F.3d 609, 614 (6th Cir. 1998).  Thus, the Court is restricted to considering arguments regarding a "clear error of law...an intervening change in controlling law or to prevent manifest injustice."  *GenCorp*, 178 F.3d at 834.

## DISCUSSION

In granting the Defendants' Motion for Summary Judgment, the Court applied an arbitrary and capricious standard of review to the Defendants' decision to discontinue Curry's LTD benefits.  This standard of review is used when a benefit plan gives the administrator discretion to determine eligibility or construe the plan's terms.[1]  *Firestone Tire and Rubber Co.*

---

[1]The portion of the LTD Summary Plan Description entitled PLAN INTERPRETATION states in pertinent part:

Benefits under the Eaton Long Term Disability Plan will be paid only if the Plan Administrator and/or Claims Administrator decides that the applicant is entitled to them under the terms of the Plan.  The Plan Administrator and/or Claims Administrator has discretionary authority to determine eligibility for benefits and to construe any and all terms of the Plan, including but not limited to, any dispute or doubtful terms.  The Plan Administrator and/or Claims Administrator also has the power and discretion to determine all questions arising in connection with the administration, interpretation and application of the Plan.  Any and all

3

*v. Bruch*, 489 U.S. 101, 115 (1989).  The Court's use of this standard of review has not been challenged.

When applying an arbitrary and capricious standard of review, the Court must determine whether "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062,1071 (6th Cir. 1994) (citing *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir. 1989)).  If such an explanation is available, this Court must respect and uphold the decision of the claims administrator.  *Id.*  In evaluating those decisions, this Court must consider only the evidence before the administrator at the time, *Daniel v. Eaton Corp.*, 839 F.2d 263, 266-67 (6th Cir. 1988), and must account for potential conflicts of interest.  *Kulkarni v. Metro. Life Ins. Co.*, 187 F. Supp.2d 724, 727 (W.D. Ky. 2001) (citing *Bruch*, 489 U.S. at 115; *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998).  "An ERISA plan administrator's denial of benefits is not arbitrary and capricious as long as it is rational in light of the plan's provisions."  *Miller v. Met Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991).

While this is a deferential standard, the "review is no mere formality."  *Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 666 (6th Cir. 2006).  The Court cannot simply "'rubber stamp the administrator's decision.'"  *Id.* (quoting *Jones v. Metro. Life Ins. Co.*, 385 F.3d 654, 661 (6th Cir. 2004) (citation omitted)).  Instead, the Court must "review 'the quality and quantity of the medical evidence and the opinions on both sides of the issues.'" *Id.* (quoting *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir. 2003))

---

determinations by the Plan Administrator and/or Claims Administrator will be conclusive and binding on all persons, except to the extent reviewable by a court with jurisdiction under ERISA.

The Plaintiffs seek reconsideration of the Court's Order granting summary judgment to the Defendants on grounds that (1) the Defendants deprived her of a full and fair review of her claim; and (2) contrary to the Defendants' previous assertion, the Eaton Corporation Long Term Disability Plan (the "Plan") required her to apply for Social Security Disability (SSD) benefits, and the Defendants and the Court should have therefore given greater weight to the Social Security Administration's (SSA) determination that she was disabled.  The Court will address these arguments in turn.

**1.  Full and Fair Review**

    **A.  Treating Physicians v. Physician Peer Reviewers**

The Plaintiff first argues that the Defendants failed to properly credit the opinions of her treating physicians that she was "totally disabled" and instead improperly gave greater weight to the physician peer reviewers.  The Court addressed this argument at length in its previous Opinion.

The Court may grant the Plaintiff's motion only if she presents a clear error of law, an intervening change in the controlling law, or to prevent manifest injustice.  *GenCorp*, 178 F.3d at 834.  However, the Plaintiff has not presented evidence that either three of these situations apply, and has done little more than reiterate her previous arguments.

As the Court stated in its Opinion, there is no requirement that plan administrators "accord special deference to the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003).  ERISA and federal regulations enacted under ERISA "require 'full and fair' assessment of claims and clear communication to the claimant of the 'specific reasons' for benefit denials.  *Id.* (citing 29 U.S.C § 1133; 29 CFR § 2560.503-1 (2002)).

However, "these measures do not command plan administrators to credit the opinions of treating physicians over other evidence relevant to the claimant's medical condition." *Id.*  There is no "discrete burden of explanation" placed upon plan administrators "when they credit reliable evidence that conflicts with a treating physician's evaluation." *Id.* at 834.

Given all of this, however, plan administrators still cannot "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id*.  However, the Court did not, and does not, find that the Defendants arbitrarily refused to credit the evidence of the Plaintiff's treating physicians, depriving her of a full and fair review.  There is sufficient information in the record to show that the Defendants at least considered the opinions of Dr. Feltner, who diagnosed the Plaintiff with fibromyalgia, Dr. Raque, the Plaintiff's neurologist, and Dr. Tirabasso, to whom the Plaintiff was referred by Dr. Raque for lumbar epidural steroid injections, and did not dismiss their opinions without reason.  That consideration is all that is required under the arbitrary and capricious standard.  *See Harris v. Kemper Ins. Cos*., 360 F. Supp. 2d 844, 849 (E.D. Mich. 2005).  Contrary to the Plaintiff's assertion, there is no evidence that the Defendants "disregarded" their opinions.

In her Motion to Alter, Amend, or Vacate, the Plaintiff actually identifies the reasons given by the Defendants for not following the assessments of the treating physicians.  By highlighting these reasons, the Plaintiff shows that the Defendants did not arbitrarily refuse to credit the opinions of those physicians.  The arbitrary and capricious standard of review is deferential, and requires only "a reasoned explanation, based on the evidence, for a particular outcome." *Bartling*, 29 F.3d at 1071.  The Defendants chose to rely on the consistent reports of multiple peer reviewers in terminating the Plaintiff's LTD benefits.  The Court found in its

6

previous Opinion that in doing so, the Defendants offered a reasoned explanation based on the evidence in the Administrative Record,  and the Court therefore upheld the decision of the Defendants not to credit the opinions of the Plaintiff's treating physicians.

The Plaintiff understandably disagrees with the Defendants' assessment of her disability. However, she has not presented any grounds on which the Court may reconsider its judgment that the Defendants did not fail to properly credit the contrary opinions of her treating physicians in determining that she was not disabled from "any occupation" as defined by the Plan.

### B.  "Cherry-picked" information

The Plaintiff next reiterates her previous argument that throughout the review process Broadspire provided the physician peer reviewers, the physical therapist who conducted the Functional Capacity Evaluation (FCE), and the Field Care Manager who prepared the Labor Market Survey (LMS) and Employability Assessment Report (EAR) with "cherry-picked" information regarding her medical condition.  In its previous Opinion, the Court found no evidence of "cherry-picking" with respect to the information provided to the peer reviewers or the physical therapist.  However, the Court did find evidence of "cherry-picking" with respect to the LMS and EAR.

### i.  Dr. Cohan and Dr. Superfine

In November 2003, prior to its initial termination of the Plaintiff's LTD benefits, Broadspire referred the Plaintiff's claim file to two physician peer reviewers as part of its routine review of her claim.  These two peer reviewers, Dr. Vaughn Cohan, a neurologist, and Dr. Russell Superfine, an internal medicine specialist, both concluded that the Plaintiff was capable of sedentary work.

The Plaintiff claims that Dr. Cohan reviewed no more than nine pages of documentation and was not provided certain office notes from Dr. Raque.  In his peer review, Dr. Cohan states that he reviewed "Attending Physician statement, medical notes from Dr. Raque, Neuro Surgeon and Resource Questionnaire; attached to 9 pages."  (AR 262).  The Court cannot tell what medical notes Dr. Cohan did review based on this, and will not presume that he did not review all applicable notes without real evidence to the contrary.

As a neurosurgeon, it appears that Dr. Cohan was asked only to review the opinions of the Plaintiff's neurosurgeon, Dr. Raque, and documentation associated with the Plaintiff's back pain.  In its Opinion, the Court declined to adopt the Plaintiff's argument with regard to the information provided to Dr. Cohan because her allegations were subjective, and the Court finds that the Plaintiff's attacks on Dr. Cohan's review have not moved beyond the subjective.

As an internal medicine specialist, it appears that Dr. Superfine was asked by Eaton to only review the Plaintiff's diagnosis of fibromyalgia by Dr. Feltner.  The Plaintiff claims that Dr. Superfine stated in his report that he would need to review additional documentation in order to make a proper determination of her fibromyalgia.  However, the Plaintiff misconstrues Dr. Superfine's statement, and this is not evidence of cherry-picking.

Dr. Superfine states that while the Plaintiff had been diagnosed with fibromyalgia, the information in the record related to that diagnosis did not actually support "a functional impairment which would preclude the claimant from performing the duties of any occupation," and that based on her records, she could perform sedentary activities.  (AR 265).  Dr. Superfine's point was that he believed the fibromyalgia diagnosis was not properly supported, and therefore, the Plaintiff could support her disability status by submitting "a complete current physical

8

examination with emphasis on the musculoskeletal, mental status, and neurological examinations," along with thyroid function studies and a Functional Capacity Evaluation, which was eventually commissioned by Broadspire. (AR 265). The Court sees no evidence that Dr. Superfine was stating that he should have been provided those existing records, but instead, that it would assist the Plaintiff if such records did exist. Therefore, the Court sees no evidence of cherry-picking in Dr. Superfine's report.

The Plaintiff has not presented any information with regard to the reviews of Drs. Cohan and Superfine that would support vacating the grant of summary judgment to the Defendants. There is no clear error of law, intervening change in controlling law or manifest injustice associated with their peer reviews. *GenCorp*, 178 F.3d at 834.

### ii. LMS and EAR

The Plaintiff also argues that the Defendants misrepresented their reliance upon the LMS and EAR prepared by Chau D. Nguyen-truong in March and April 2004. The Plaintiff argues that the faulty LMS and EAR were *relied upon* by all subsequent reviewers engaged by the Defendants, tainting the review process throughout her appeal of the initial termination.

In its Opinion, the Court did find evidence that the LMS and EAR were produced with the use of "cherry-picked" information, as there was no evidence that Nguyen-truong considered the opinions of Dr. Raque in creating the reports. This is problematic because Dr. Raque had been treating the Plaintiff since 1996, and there were reports in the record in which Dr. Raque indicated that, in his opinion, the Plaintiff was totally disabled.

Further, the Court found that the LMS and EAR were unreliable because they incorrectly identified the Plaintiff's labor market and almost exclusively located customer service positions

in Ohio (outside the correct labor market for the Plaintiff), while the Plaintiff has only worked factory or janitorial jobs since graduating high school in 1970, and has not worked since she ceased working for Eaton on July 7, 1996.  Thus, the assessment of the Plaintiff's actual ability to find work in her labor market was flawed.

Therefore, the Court stated "to the extent Broadspire may have relied upon the LMS and EAR in initially denying Curry LTD benefits, the Court finds the decision would have been arbitrary and capricious."  However, the Court ultimately held that the unreliable reports did not render the decision arbitrary and capricious because the Defendants did not rely upon them in deciding to terminate the Plaintiff's benefits.  The Defendants claimed (1) the reports are not listed in the Plan as evidence that may be used to substantiate a disability claim, (2) are primarily meant as aids for Plan participants whose benefits are denied or discontinued, and who must reenter the work force, and (3) were not prepared by a medical professional, and therefore would not have assisted in reaching a conclusion regarding Curry's disability.  As it did not appear to the Court based upon the Administrative Record the Defendants "relied" upon the reports, the Court did not consider them in determining whether the Defendants' decision was arbitrary and capricious.

The Plaintiff now argues that these claims made by the Defendants, which the Court accepted as true, were misrepresentations.  The Plaintiff urges the Court to reconsider the Defendants' use of the EAR and LMS.  The Plaintiff claims that the Defendants actually impermissibly "relied" upon the EAR and LMS in initially and finally deciding terminate her LTD benefits.  The Defendants have not responded to these claims.

### a.  LMS and EAR and the initial termination of benefits

It appears from the Administrative Record that Isabel Venkatesan was the Broadspire Disability Claims Specialist at least partially in charge of the initial decision to terminate the Plaintiff's LTD benefits.  Ms. Venkatesan is the author of the initial termination letter, and she appears to have made many of the entries in what seems to be a chronology of the Plaintiff's case maintained by Broadspire.  (AR 525).  An entry by Ms. Venkatesan in the chronology dated March 31, 2004, discusses an email to Chau Nguyen-truong about the status of the LMS report.  (AR 542).  An April 21, 2004, entry indicates that she had again contacted Nguyen-truong about the LMS report, as "CE needs this info to be able to finish reviewing if EE is able to work or not."  (AR 544).  An entry the following day, April 22, 2004, states:

> Review claim w/ supervisor, Abby Rosenberg, CE advise peer review done by Dr. Superfine, Internal Medicine & Dr. Cohan, Neurology fail to support TDAO.  FCE done on 12-18-03 found EE can work @ a sedentary position.  EA/TSA done on 3-8-04 found several jobs as cashier, assembler, string-machine tender, label pinker.  LMS done 4-1-04 found jobs available.  Therefore, LTD benefits terminated as of 6-1-04.

This entry does seem to indicate that the initial termination decision was a result of the combination of the results of the two peer reviews that had been conducted at that time, the FCE, and the EAR and LMS.

The initial termination letter from Ms. Venkatesan states: "We have completed a medical *and vocational* review of your file to determine if you are capable of returning to the work force."  (AR 361) (emphasis added).  The letter also sets forth the basic findings of the EAR and LMS.  (AR 363).  The letter does not explicitly state that the findings of the EAR and LMS contributed to the decision to discontinue the Plaintiff's LTD benefits, but it does seems to indicate that the findings were a factor in the decision.

The EAR and LMS were not provided to Broadspire until after it had collected the peer

11

reviews of Drs. Cohan and Superfine and the FCE had been performed by physical therapist Laura Goulbourne.  Thus, the peer reviews and FCE are not faulty for having relied on an inappropriate assessment of the Plaintiff's employability.  It appears that these documents together comprise the set of evidence created specifically for the purpose of evaluating the Plaintiff's disability status at this stage.  The Court has already determined that it was not arbitrary and capricious for Broadspire to rely upon the reviews of Drs. Cohan and Superfine.  The Plaintiff has reiterated her argument that the FCE was inadequate, but has presented no valid or persuasive reason for the Court to reverse its previous determination that the Defendants' reliance on the FCE was not arbitrary and capricious.  *See GenCorp*, 178 F.3d at 834.

It is impossible to determine the exact nature of the role the conclusions in the EAR and LMS played in Broadspire's decision that the Plaintiff was no longer totally disabled from "any occupation."  However, the Court does believe that it would have been arbitrary and capricious for Broadspire to make the EAR and LMS the most important factor in the decision.  Given this, the Court cannot find that Broadspire's initial termination was arbitrary and capricious merely because the LMS and EAR were a part of the package of documents used to make the decision. However, the Court will consider the apparent use of the faulty LMS and EAR as a factor in the ultimate determination as to whether its previous Opinion and Order should be vacated.

### b. Plaintiff's appeal of the initial termination: Drs. Sassoon and Meyerson

After the Plaintiff formally appealed the initial decision to discontinue her LTD benefits, Broadspire engaged two more physician peer reviewers to review the Plaintiff's file.  After receiving these reports and new documentation from the Plaintiff, Broadspire informed the Plaintiff that after reviewing the file, its original decision to discontinue her LTD benefits would

12

be upheld.  The peer reviewers engaged at this stage are the only two peer reviewers that the

Plaintiff argues were inappropriately provided with, and asked about, the EAR and LMS.

Both Dr. Eddie Sassoon, specializing in physical medicine and rehabilitation, and Dr.

Sheldon Meyerson, specializing in neurosurgery, were provided the EAR and LMS, in addition

to many other pertinent documents, including medical office records from Dr. Raque from 1996

through 2003.  Both reviewers were asked to review the EAR and LMS and "advise if the

alternative positions identified are appropriate based on your review of the clinical evidence."

(AR 433, AR 437).  The doctors were not asked to evaluate the quality of the reports themselves,

but were asked to determine whether the actual jobs listed were appropriate for the Plaintiff

based on their review of the large quantity of evidence they were provided, including Dr.

Raque's records not provided to Nguyen-truong.

The Plaintiff asserts that because Drs. Sassoon and Meyerson concluded she could

perform the jobs listed in the reports, they therefore concluded that she was disabled.  The Court

disagrees.  The question about the EAR and LMS was one among five posed to the doctors, and

the other four questions related to whether the information in the record supported a

determination that the Plaintiff was disabled from "any occupation."  Dr. Sassoon and Dr.

Meyerson both concluded that the record did not support a "functional impairment from any

occupation."  They both reached this conclusion before addressing whether the positions listed in

the EAR and LMS were appropriate for the Plaintiff.

Dr. Sassoon concluded that sedentary positions appeared to be appropriate "based upon

the clinical documentation including diagnostic studies, clinical studies, and functional capacity

evaluation report that was conducted."  (AR 434).  Dr. Meyerson stated that he believed the

13

majority of the jobs in the EAR could be handled by the Plaintiff, but a few were borderline and should not be done.  Thus, even given his reservations about portions of the EAR, Dr. Meyerson still concluded that the Plaintiff was not disabled from "any occupation" in light of all of the other evidence.

Given all of this, the Court sees no evidence that the peer reviewers Drs. Sassoon and Meyereson "relied" upon the EAR and LMS in reaching their conclusions.  Therefore, the Defendants' decision at this stage to uphold the initial termination of benefits was not arbitrary and capricious.

### c.   LMS and EAR: the final determination letter

The final determination letter issued by Eaton also mentions the findings of the faulty EAR and LMS in the "Background" section.  (AR 53).  The final determination letter also indicates that the EAR and LMS were documents, among the many, that Eaton reviewed in reaching its final decision.  (AR 59).  However, the Court cannot find objective evidence in the letter that the EAR and LMS were used as a basis for the final termination of the Plaintiff's LTD benefits.  When Eaton made its final determination, the Plaintiff's claim file contained the various medical records created and submitted throughout the life of her claim, questionnaires, the FCE, and nine peer reviews, among other documents.

The EAR and LMS are not mentioned in either the "Determination" or "Basis for Determination" section of the final determination letter.  Instead, those sections indicate that the final decision was based only on the medical evidence.  Eaton's final "Determination" was:

> Ms. Curry has not provided medical findings sufficient to establish that she is totally and continuously unable to perform any occupation.  Therefore, Ms. Curry's appeal is denied.

Eaton's "Basis for Determination" states:

The determination to deny Ms. Curry's appeal and entitlement to continued long term disability benefits under the Disability Plan is based on the definition in the Disability Plan, the need for objective, clinical medical findings to support a finding of disability, a review of Ms. Curry's medical records, and the conclusion of the independent medical professionals retained by the Plan Administrator to assist in making this determination.

Ms. Curry's medical records do not support a finding of disability.  Ms. Curry's medical records reflect that she appears to suffer from a number of medical conditions, including chronic back pain, fibromyalgia, thyroid disease and depression.

With respect to depression, the Disability Plan provides that, in order to be deemed disabled due to mental illness, the determination must be made by a psychiatrist.  Ms. Curry's records do not reflect any treatments by a psychiatrist.

None of the records provide evidence of Ms. Curry's inability to perform sedentary work.

Although the medical records make reference to fibromyalgia, there are no physical findings or history documented to support or describe the diagnosis.

With respect to her back pain, the reviewer notes that she has MRI evidence of degenerative disc disease, but that such degenerative disc disease occurs with aging.  In addition, physical examinations related to back pain have been sporadic and mostly negative with only a few descriptions of limited range of motion.  Ms. Curry has indicated that the pain is not significant enough to require surgery.

Although Ms. Curry's physicians have opined that she is unable to work, they do not provide any objective clinical medical evidence to support these opinions.  Further, each medical reviewer of Ms. Curry's information concluded that the objective information did not support a finding that Ms. Curry was unable to perform any occupation.  A March 8, 2004 functional capacity evaluation reflected an ability to work at the sedentary level. The independent medical reviewers retained by the Plan Administrator concluded that, based on the available medical information, Ms. Curry would not be disabled from any occupation on June 1, 2004.  (The independent reviewers will be identified upon written request).  The independent medical reviewers' conclusions were based on their review of the medical records.

The Plan Administrator's determination as described in this Action afforded no deference to the initial adverse benefit determination or to the Claims Administrator's denial of the first level appeal regarding Ms. Curry's claims for continued long term disability benefits under the Disability Plan.

The Court recognizes that the absence of a reference to the EAR or LMS as a "basis" for

the final determination does not conclusively establish that the reports did not influence Eaton's

15

decision.  However, the Plaintiff has not presented evidence on which the Court may conclude

that there was a clear error of law, intervening change in controlling law or manifest injustice

associated with the final determination.  *GenCorp*, 178 F.3d at 834.

> As noted above, the final determination letter explicitly stats:

> The Plan Administrator's determination as described in this Action afforded no deference to the initial adverse benefit determination or to the Claims Administrator's denial of the first level appeal regarding Ms. Curry's claims for continued long term disability benefits under the Disability Plan.

> The Court determined above that it would consider the apparent use of the faulty LMS

and EAR in Broadspire's initial determination as a factor in its arbitrary and capricious analysis.

In the final determination letter, Eaton asserted that the initial determination did not influence the

final determination.  However, the Court cannot say with absolute certainty that this was the

case.  In deciding whether the Plaintiff's Motion to Alter, Amend, or Vacate shall be granted, the

Court will consider the fact that the initial use of the faulty LMS and EAR may have influenced

Eaton's ultimate decision to discontinue the Plaintiff's LTD benefits.

## 2.  Social Security Disability Benefits

In its Opinion granting summary judgment to the Defendants, the Court determined that

it was not arbitrary and capricious for the Defendants to conclude that the Social Security

Administration's (SSA) determination that the Plaintiff was totally disabled under SSA

guidelines was not relevant to the Defendants' determination that the Plaintiff was disabled from

"any occupation" under the terms of the Plan.  The records reflects that the Plaintiff applied for

and was awarded LTD benefits effective January 4, 1997.  The Plaintiff applied for and was

awarded social security disability (SSDI) benefits on March 27, 1998, the Administrative Law

Judge (ALJ) determining she had been totally disabled since June 27, 1996.  She was granted

SSDI benefits through December 31, 2001. The decision by the ALJ indicates that the Plaintiff had previously applied for SSDI benefits and been denied. (AR 421).

Under an offset provision in the Plan, in November of 1998 the Plaintiff refunded $9,301.81 that had been paid to her by Eaton for the period of December 1, 1996 to July 8, 1998. (AR 166, 169, 170). In 2002, the SSA reviewed the Plaintiff's disability and continued her benefits. There does not appear to be any documentation in the Administrative Record concerning the Plaintiff's SSDI benefits renewal beyond an affidavit from the Plaintiff stating the fact. (AR 385).

The Court noted in its Opinion:

...the SSA's initial determination to award Curry benefits occurred six years before Broadspire discontinued Curry's LTD benefits, and eight years before Eaton, as Plan Administrator, issued a final determination upholding Broadspire's denial of continued LTD benefits after May 31, 2004. Thus, the Plan considered Curry's condition much later in time, and received substantial medical evidence that did not exist at the time of the SSA's ruling, including (1) two peer reviews of Curry's claim file in November 2003; (2) the independent Functional Capacity Evaluation conducted in December 2003; (3) two peer reviews conducted in April 2005; (4) three peer reviews conducted in October and November 2005; and (5) two independent third party medical reviews in December 2005. All of these concluded there was no evidence to support a claim of Curry's total disability precluding her from work in "any occupation."

The Court also stated that there was no indication in the record that Curry filed for SSA benefits at the Defendants' direction or encouragement. However, in a footnote, the Court noted that when a plan administrator requires and/or actively encourages a claimant to apply for social security benefits, and then benefits from the SSA determination by seeking reimbursement for LTD benefits payments, a court should give such a determination greater weight in evaluating the administrator's decision under the arbitrary and capricious standard. *See Glenn*, 461 F.3d at 666-669; *Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 293-95 (6th Cir. 2005).

17

At the time, the Court was unaware that the Summary Plan Description for the Eaton LTD Plan does direct claimants to apply for SSDI benefits or run the risk of losing a portion of their LTD benefits.  (AR 35).  The section entitled "How to Obtain Benefits" in the Summary Plan Description describes applying for SSD benefits.

Claimants are not specifically instructed that in order to apply for LTD benefits they must first apply for SSDI benefits.  However, a claimant's LTD award is automatically reduced by an estimate of the amount the claimant is eligible to receive from Social Security unless he or she submits satisfactory evidence that they applied for SSDI benefits and were denied.  It appears that for benefits to have been considered "denied," the claimant must apply, reapply, and appeal the denial before an Administrative Law Judge.  Thus, "it is important" that claimants apply for any other benefits for which they are eligible to receive before they are eligible to receive long term disability benefits.  (AR 35)

While Eaton at least strongly encourages, if not essentially requires, claimants to apply for Social Security benefits, it does not appear that Eaton offers any assistance in obtaining those benefits.  The Summary Plan Description contains no specific instructions nor does it direct claimants to a particular law firm or attorney.  The Plaintiff has not pointed to any such provision nor has she pointed to any document in the Administrative Record indicating that Eaton actively assisted her in obtaining the benefits.

In a situation such as this, "[i]f the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the

18

decision was arbitrary or capricious." *Bennett v. Kemper Nat'l Servs.,* 514 F.3d 547, 554 (6th Cir. 2008) (citing *Glenn*, 461 F.3d at 669).

Here, it is clear that, under the terms of the plan, the Defendants at least actively encouraged the Plaintiff to apply for social security benefits.  Further, Eaton benefitted from the SSA's determination that the Plaintiff was disabled, because she sought and received reimbursement for LTD benefits payments in the amount of $9,301.81.  As the Defendants financially benefitted from the government's determination that the Plaintiff was disabled, they should have given appropriate weight to that determination.  *Glenn*, 461 F.3d at 669.  "An ERISA plan administrator's failure to address the Social Security Administration's finding that a claimant [is] 'totally disabled' is [a] factor that can render the denial of further long-term disability benefits arbitrary and capricious."  *Id.* (citing *Calvert*, 409 F.3d at 295).

Given all of this,  the Court did not appropriately consider the Plaintiff's receipt of Social Security disability benefits in its Opinion granting summary judgment to the Defendants.  The Court should have given the SSA's determination greater weight in evaluating the Defendants' decision under the arbitrary and capricious standard.  *See Bennett,* 514 F.3d at 554; *Glenn*, 461 F.3d at 666-669; *Calvert*, 409 F.3d at 293-95.  Thus, now, the Court must determine whether the Defendants considered and/or addressed the SSA's contrary findings.

The initial termination letter from Ms. Venkatesan does not mention the SSDI benefits, although Eaton and its administrator at the time, First Health, had demanded and received a refund for their overpayment in 1998.  Further, the Court has reviewed the record and found that the SSA's decision was provided to, at least, peer reviewers Dr. Sassoon (AR 433), Dr. Meyerson (AR 436), Dr. Bowman (AR 466), Dr. Wancier (AR 471), Dr. Cohen (AR 477), and to

19

the two independent third party medical reviewers engaged through Medical Review Institute of America (MRIoA) (AR 62, 65).  However, none of the peer reviewers discussed the impact of the SSA's determination on their own findings.

The final determination letter from Eaton states in the "Background" section: "a decision of the SSA dated 3/27/98 concluded that Ms. Curry was disabled based on her chronic back pain and bipolar disorder.  The decision concluded that she did not have transferable skills and that there are no jobs existing in significant numbers which she could perform."  (AR 51).  The letter also lists correspondence from the SSA and the 1998 SSA decision as documents "reviewed for final appeal."  (AR 58).  However, the letter fails to address why the contrary SSA determination was disregarded, and the Court cannot determine if it was given any weight at all.  *See Glenn*, 461 F.3d at 669.

Recently, in *Bennett*, the Sixth Circuit determined that Broadspire's decision to terminate a different plaintiff's LTD benefits was arbitrary and capricious in part because "the defendants assisted Bennett in obtaining disability benefits from the SSA, reaped financial benefits from this decision, and then Broadspire failed to explain why it reached a disability conclusion at odds with the SSA's findings."  *Bennett*, 514 F.3d at 556.  Like here, the court noted that the final termination letter mentioned the SSA's decision.  *Id.* at 553 n.6.  However, the court stated that the "mere mention of the decision is not the same as a discussion about why the administrator reached a different conclusion from the SSA."  *Id.*  The final termination letter simply listed the SSA decision as one item in a list of approximately ninety items included in the review, which was not a "discussion."  *Id.*

Given the *Bennett* decision, the Court believes that the mere listing of the SSA

20

determination in the final letter sent to the Plaintiff, and the Defendants' "silence as to the SSA's disability determination" does tend to weigh in favor of finding that the Defendants failed to engage in a "'deliberate, principled reasoning process.'" *Id.* at 554 (quoting *Glenn*, 461 F.3d at 666). While there is no evidence that the Defendants actively aided the Plaintiff in obtaining SSDI benefits, the failure to address the SSA's contrary determination may be at least some evidence that the Defendants' decision was arbitrary and capricious. *See id.*

The court in *Bennett* held that Broadspire's decision to terminate the Plaintiff's LTD benefits was not made as the result of "a deliberate, principled reasoning process." *Id.* The court stated:

> As we have discussed earlier in this opinion, the defendants assisted Bennett in obtaining disability benefits from the SSA, reaped financial benefits from this decision, and then Broadspire failed to explain why it reached a disability conclusion at odds with the SSA's findings. Similarly, the file reviews which Broadspire relied upon in denying Bennett's claim offer no discussion about the SSA's disability determination. We are also troubled by Broadspire's reliance on file reviews that imply that Bennett is not credible, when in fact, no one who actually examined Bennett reached that conclusion. Further, Broadspire's reliance on a file report that acknowledges that Bennett cannot walk or stand and can only sit for two hours and that conclusorily asserts that she can work in a sedentary capacity demonstrates a lack of principled reasoning.
>
> We finally register our serious concern that the final denial letter fails to explain the reasons for its decision. The three-page letter uses approximately one page to explain the standard for own-occupation disability. The next page simply lists the approximately ninety documents which were included in the review of Bennett's claim. The actual explanation of the decision-making process employed simply states that Broadspire did not believe that the submitted documents contained "sufficient medical evidence . . . to substantiate a significant functional impairment that would prevent[] [] Bennett from performing the essential functions of any occupation." J.A. at 313 (Final Decision). This reads like a conclusion, not a "deliberate, principled reasoning process . . . supported by substantial evidence." *Glenn*, 461 F.3d at 666. Accordingly, we hold that Broadspire's determination cannot withstand scrutiny under the "arbitrary or capricious" standard of review.

*Id.* at 556.

The facts of *Bennett*, however, are distinguishable from the case at hand, and when viewed concurrently with the facts of this case, soften the application of the *Bennett* decision to this matter.

The plaintiff Bennett went on disability leave several years after being diagnosed with multiple sclerosis.  *Id.* at 549.  When Bennett initially applied for benefits, her employer's plan was administered by a company called Kemper, which was sold to Broadspire during Bennett's appeal of Kemper's termination of her benefits.  *Id.* at 552.  The disability plan entitled Kemper to require claimants to submit to physical examinations by Kemper-approved physicians, but Kemper instead chose to rely exclusively on peer reviews.  *Id.* at 551.

Unlike here, Kemper referred Bennet to Allsup, Inc., "a company specializing in assisting people with their applications for Social Security disability benefits."  *Id.* at 550.  Bennet did not have to pay for Allsup's services, but like here, the plan provided that her LTD benefits would be reduced by the amount of SSD benefits she was awarded.  *Id.  After* Kemper determined that Bennett was not disabled under the any-occupation standard and discontinued her LTD benefits, Allsup wrote a letter on Bennett's behalf to the SSA containing proposed findings of fact, and the SSA determined that, due to her MS, Bennet was disabled within the meaning of the Social Security Act.  *Id.* at 552.

Here, Broadspire did not terminate the Plaintiff's LTD benefits prior to the SSA's determination, nor was the termination even concurrent.  When the Plaintiff was awarded SSD benefits in 1998, she had already been receiving LTD benefits under the Plan and had received short term disability benefits from July 8, 1996, through January 3, 1997.  The Defendants received reimbursement for LTD payments made to the Plaintiff, soon after the SSA's initial

determination.  The Plaintiff then continued to receive LTD benefits.

The amount of information available on the Plaintiff's claim changed and grew from 1998, and from 2002 when the SSA continued her benefits, to April 2004, when, after its regular review, Broadspire determined that the Plaintiff was no longer disabled from "any occupation" as defined by the Plan.  In addition, the amount of information available changed and grew again between the initial determination in April 2004 and January 2006 when Eaton issued its final determination.   As the Court originally noted in its Opinion:

> ...the SSA's initial determination to award Curry benefits occurred six years before Broadspire discontinued Curry's LTD benefits, and eight years before Eaton, as Plan Administrator, issued a final determination upholding Broadspire's denial of continued LTD benefits after May 31, 2004.  Thus, the Plan considered Curry's condition much later in time, and received substantial medical evidence that did not exist at the time of the SSA's ruling, including (1) two peer reviews of Curry's claim file in November 2003; (2) the independent Functional Capacity Evaluation conducted in December 2003; (3) two peer reviews conducted in April 2005; (4) three peer reviews conducted in October and November 2005; and (5) two independent third party medical reviews in December 2005.  All of these concluded there was no evidence to support a claim of Curry's total disability precluding her from work in "any occupation."

For example, the Defendants and their peer reviewers emphasized that Dr. Raque did not treat the plaintiff for over two years, from July 9, 2001, to July 14, 2003, indicating that the Plaintiffs' condition had changed.[2]  The 2004 FCE, conducted prior to the initial termination, concluded that the Plaintiff could work at a sedentary level.  The peer reviewers asked to review the Plaintiff's claim of fibromyalgia concluded that the record contained insufficient evidence of the diagnosis.  The 1998 SSA determination was based, in part, on the Plaintiff's claim that she suffered from bipolar disorder.  Records from Dr. Feltner indicated that the Plaintiff had

---

[2]The Court is not citing this gap in treatment as evidence that the Plaintiff's condition did change, but as evidence that cumulatively led to the Defendants' decision to terminate her LTD benefits.

depression (bipolar disorder is not mentioned) but the Plaintiff never produced evidence that she had been diagnosed with depression by a psychiatrist, as required by the Plan, and therefore the Defendants could not consider that condition in determining her disability status.

Further, in *Bennett*, only four peer file reviews of Bennett's file were ever conducted, and she never submitted to a functional capacity evaluation. *Id.* at 551-52. The Plaintiff's claim file was submitted to nine peer reviewers, two of whom were from the independent MRIoA, and she also submitted to a FCE. As noted above, Bennett was provided with a conclusory three-page final determination letter lacking explanation. *Id.* at 556. In contrast, here, Eaton provided the Plaintiff with a thirteen-page final determination letter that extensively sets forth the background of the claim. The basis for the determination does not read like a conclusion, but instead explains why the record does not support a finding of disability.

Thus, there are marked differences between *Bennett* and the case at hand. These differences, and the specific circumstances of the Plaintiff's claim, render it difficult for the Court to say that the Defendants' decision to terminate the Plaintiff's LTD benefits was arbitrary and capricious in light of the SSA's contrary determination.

**3. Arbitrary and Capricious?**

Under the arbitrary and capricious standard of review, if a plan administrator offers "a reasoned explanation, based on the evidence, for a particular outcome," the Court must respect and uphold the administrator's decision. *Bartling*, 29 F.3d at 1071. "An ERISA plan administrator's denial of benefits is not arbitrary and capricious as long as it is rational in light of the plan's provisions." *Miller*, 925 F.2d at 984.

The Court may grant the Plaintiff's Motion to Alter, Amend, or Vacate only if it has

24

found a clear error of law in its previous decision, that there has been an intervening change in controlling law, or in order to prevent manifest injustice. *GenCorp*, 178 F.3d at 834. The Plaintiff has not been provided with another opportunity to argue the merits of her case. *Id*. The Plaintiff has not argued that there has been an intervening change in controlling law, nor has she argued that the Court incorrectly applied the law in its previous Opinion. *Id.* Instead, the Plaintiff argues that the previous Opinion was a result of the fault interpretation and application of the facts. If this is so, it could be argued that the Court must reverse its decision in order to prevent a manifest injustice. *Id.*

The Court upholds its previous determination that it was not arbitrary and capricious for the Defendants to adopt the opinions of the peer reviewers that the Plaintiff was not disabled from "any occupation" under the terms of the Plan. Thus, the Court will not consider this argument.

However, the Court does believe that to the extent that the Defendants "relied upon" the faulty LMS and EAR, such reliance was arbitrary and capricious. However, the exact nature of the Defendants' reliance is not clear in the record. In light of all the other medical evidence the Defendants considered in reaching their decisions, the Court cannot say that the LMS and EAR were the driving force behind the benefits termination, or even a notable force. Therefore, the Court cannot say that it must grant the Plaintiff's motion on the grounds that it would prevent a manifest injustice due to the Defendant's reliance on the reports.

As for the Plaintiff's SSDI benefits, the Court admits that it erroneously previously found that there was no evidence that the Defendants required to actively encouraged the Plaintiff to apply for SSDI benefits. The terms of the Plan's "How to Obtain Benefits" section most

25

certainly amount to at least an active encouragement.  Further, the Defendants benefitted from the Plaintiff's application for and grant of SSDI benefits in the form of the reimbursement.

Given this, the Court must now give greater weight to the Defendants' contrary determination of the Plaintiff's disability status than in the previous Opinion.  *See Glenn*, 461 F.3d at 666-669; *Calvert*, 409 F.3d at 293-95.  The Court has examined the specific circumstances of the Plaintiff's claim.  It is true that the Defendants failed to discuss why they reached a disability conclusion at odds with the SSA's determination of the Plaintiff's disability. *Bennett*, 514 F.3d at 556.  However, for the reasons set forth above, the Court cannot find that the Defendants' decision was arbitrary and capricious.

The term "manifest injustice" implies that the Court must be faced with a disability determination so patently unfair and tainted that the error is manifestly clear to all who view the record.  The Court does not find such a manifest injustice in the Defendants' determination that the Plaintiff was not disabled from "any occupation," under the terms of the Plan, in contrast to the SSA's determination in 1998 and 2002 that the Plaintiff was disabled under the Social Security Act.

The standard of review guides this decision.  If the Court were sitting de novo, it might well reach a different conclusion.  However, for all the reasons above, the Court finds it must deny the Plaintiff's Motion to Alter, Amend, or Vacate.

## CONCLUSION

For the foregoing reasons, the Plaintiff's Motion to Alter, Amend, or Vacate is **DENIED**. An appropriate order shall issue.

26